Northern Insurance Co. *v.* Morris et al.
Connecticut Fire Insurance Co. *v.* Morris et al.
Connecticut Fire Insurance Co. *v.* Morris et al.
Glen Falls Insurance Co. *v.* Morris et al.

(Decided January 28, 1929.)

*Messrs. Stearns, Chamberlain & Royon,* and *Messrs. Hicks & Folonie,* for plaintiffs in error.

*Messrs. Dustin, McKeehan, Merrick, Arter & Stewart,* for defendants in error.

SULLIVAN, P. J. The four cases above named are here as proceedings in error to the common pleas court of Cuyahoga county, and it is stipulated between counsel of record that the same questions are raised in each and all of the cases, and that the record and bill of exceptions shall apply to each of the actions, in so far as the facts are identical.

Action was commenced in the common pleas court by Emily Morris, the Guardian Trust Company, and the Sampliner Realty Company against the insurance companies named in the above titles to recover upon policies of fire insurance issued to Emily Morris, and one of the provisions of the policies indemnified Emily Morris against loss by fire to a certain residence described in the policies. The cases, which are here on the bill of exceptions, were tried to a court and jury, and a verdict and judgment found for plaintiffs below, and it is sought to reverse the judgment of the court below on the ground that the verdict is contrary to the evidence and the law, and it is specifically urged and argued as grounds of error that Emily Morris, at the date of the loss, was not a party to the contract of insurance, and by reason thereof was not in law entitled to recover; that the Sampliner Realty Company increased the hazard contrary to the provisions of the policy, and that this increase of hazard existed and operated at the time of the fire, which, being so, this company was not entitled to recover; and that the Guardian Trust Company was aware of this increase of hazard, and failed and neglected

under the terms of the agreement to advise the insurance companies. These are the contentions of plaintiffs in error, the insurance companies, but they are resisted by Emily Morris, who contends that she was a party to the contracts of insurance at the time of the fire; that there is no evidence in the record of a credible nature tending to show that Emily Morris or the Guardian Trust Company was aware of any change in the use of the dwelling, and that, therefore, under the provisions of the policies, there was legal liability on the part of the insurance companies; and it is further contended that the record shows affirmatively that, if there was an increase of hazard or change of use of the premises, it was brought home to the knowledge of the insurance companies a long time prior to the fire. It is claimed that, notwithstanding this knowledge, the insurance companies waived any defense which they might have had with respect to the increased hazard, and that therefore the terms and provisions of the policies were in full force and effect.

It appears from the record that in May, 1924, defendant in error, Emily Morris, was the owner in fee simple of numerous tracts of land in Cuyahoga county, located on the shores of Lake Erie, and that numerous cottages, a dwelling house, an inn, both houses and garages, and several other buildings, were constructed thereon. Numerous policies of insurance were issued to the assured on these buildings, among which was a structure known as a dwelling house, which was destroyed by fire, and is the subject of the contention here as to peril and hazard. The insurance on these buildings also covered the contents thereof, the policies were all iden-

tical in their terms, and the aggregate amount of insurance on this particular dwelling house under consideration was $20,000, and upon its contents $6,000, each policy providing in its terms for a *pro rata* payment. Mrs. Morris was the assured under these policies, and paid for their issue under the terms thereof, and, at the time they were taken out, she was the only party insured, but it appears from the record that on May 31, 1924, Mrs. Morris borrowed $12,000 from the Guardian Trust Company, to secure which loan she mortgaged the premises to this company, among the terms of the mortgage being a standard mortgage clause of usual application, which was added as a rider to each policy in the words following: "Loss, if any, on building payable to The Guardian Trust Co., as mortgagee (or trustee), as such interest may appear."

It further appears by the record that on June 21st of the same year Mrs. Morris leased the entire premises to defendant in error, the Sampliner Realty Company, whereupon the company by purchase became the owner of the contents of the dwelling house, the subject of contention here, and the company under the lease thereupon assumed occupancy and possession, and it appears that, for the purpose of protecting the mortgagee and the lessee, the insurance companies attached indorsements to the policies in question, the following four of which only are under discussion here:

"Cleveland, Ohio, June 24, 1924. Emily Morris. It is hereby understood and agreed that The Sampliner Realty Company, Lessee, shall be recognized as the assured under this policy.

"It is further understood and agreed that the fee

to the property described under this policy is now in the name of Emily Morris and has been leased by her to The Sampliner Realty Co., as Lessee, for the term of ninety-nine (99) years, beginning May 1, 1924, and ending April 30, 2023.

"Loss, if any hereunder, shall be payable to:

"The Guardian Savings & Trust Company, Mortgagee of the fee; and

"The Guardian Savings & Trust Company, Trustee, in accordance with the provisions of the ninety-nine year lease.

"This policy, as to the interest therein of the said payee, as mortgagee (or trustee) only, shall not be invalidated by any act or neglect of the mortgagor or owner of the within described property, nor by the commencement of foreclosure proceedings, nor the giving of notice of sale relating to the property, nor by any change in the interest, title or possession of the property, nor by any increase of hazard; Provided that in case the mortgagor or owner shall neglect to pay any premium due under this policy, the mortgagee (or trustee) shall, on demand, pay the same; and provided further that the mortgagee (or trustee) shall notify this Company of the commencement of foreclosure proceedings, and of any notice of sale relating to the property, and of any change of ownership or occupancy or increase of hazard which shall come to the knowledge of said mortgagee (or trustee)."

Later on Mrs. Morris left the premises, and there is no evidence of credible nature to show that she had knowledge of the uses to which the premises were thereafter employed.

Later on the Sampliner Realty Company, increas-

ing the furnishings of the dwelling house, sublet it to various persons, who assumed possession and occupancy, but who, without any knowledge on the part of Mrs. Morris or the Guardian Trust Company, transformed the dwelling house into a roadhouse and hotel, which continued until January 9, 1925, when the village of Euclid officially closed the premises, and from that date, January 9, 1925, until January 24, 1925, the record seems to be clear and convincing that the structure remained unused and closed, excepting its occupancy by a caretaker, but it is claimed and argued by counsel for plaintiffs in error that by concealment and stealth the uses of the dwelling house as a roadhouse and hotel did not cease, but were continued from January 9, 1925, when the authorities of Euclid village supposedly closed it, until the time of the fire, but it is our judgment, from an examination of the record, that the activities of the roadhouse and hotel ceased on January 9, 1925, and there is no evidence of a substantive or credible nature affirmatively appearing in the record, or otherwise, that on January 24, 1925, at 3:00 a. m., when the fire occurred, the structure in question was then and there being used in any manner except for occupancy by the watchman or caretaker.

It further appears that the direct cause of the fire arose from an overheated gas grate, which was co-existent with the life of the building; that the watchman in the early evening, before the fire, for the purpose of warming the room, lighted the gas at the grate, and left it burning so high that during the night, on account of increase of pressure, the building took fire on the third floor, the result of which

was the total destruction of the building and its contents.

After proofs of loss were furnished, the insurance companies rejected the claims because of the transformation of use from a dwelling to a roadhouse and hotel, and, indeed, there is an attempt to show that the change included possession of the dwelling by the gambling fraternity. However this may be, the insurance companies rejected the claims on the ground of increased hazard, and the consequence was the commencement of litigation, represented by nine different causes of action brought by Emily Morris, the Guardian Trust Company, and the Sampliner Realty Company against the insurance companies. It may be noted in passing, and it seems important as well, that five of the cases were removed to the federal court, the United States District Court for the Northern District of Ohio, Eastern Division, where, upon trial of the five cases jointly, judgments were rendered in favor of Mrs. Morris and the Guardian Trust Company, which judgments, upon proceedings in error, were affirmed by the United States Circuit Court of Appeals for the Sixth Circuit, *Hartford Fire Ins. Co.* v. *Morris,* 27 F., (2d), 508, sitting in Cincinnati, Ohio. The other four cases are the causes of action denominated in the caption herein.

Coming to the assignment of error that the judgment of the common pleas court should be reversed because of the evidence of increased hazard disclosed by the record, after examination of the facts it is clearly conclusive that the cause of the fire which resulted in the destruction of the building in question was absolutely unrelated to any change in

the use of the building from a dwelling to a road-house, or hotel, or gambling institution. There is no necessity for any abstruse reasoning to show this lack of relationship, because it is a fact indisputable in the record that the sole cause of the destruction of the building was the lighting of a fire in cold weather for the purpose of producing warmth in a gas grate, and that the pressure of gas increasing during the night the fire reached inflammable material, from which resulted the fire and its disastrous consequence.

Were it a fact that, because of the use of the building as a hotel or roadhouse, some patron had dropped a lighted cigarette in the early hours of the morning, and ignited something inflammable, causing the building to burn down, then it is possible that this circumstance would be consequent upon the use and occupancy of the building as a road-house, hotel, or a place to gamble. Again, if because of this unauthorized occupancy, by reason of a brawl over the gaming table, or otherwise, something inflammable came in contact with fire, then it might be said that this act was the logical result of the change of the use of the premises from a dwelling house to a roadhouse or hotel. Again, if by reason of the occupancy of the building as a roadhouse any act was committed by patrons, in their capacity as occupants and patrons of the roadhouse, and the fire resulted, then it could be said again that the increased hazard was the cause of the loss. And these instances may be multiplied by letting the mind roam over the field of conjecture. There is, however, an utter absence of any circumstances of the nature suggested and described in this discus-

sion. Every dwelling house, as a rule, has a fireplace, and the gas grate in the building in question here was a component part of the building itself, and was a necessary requisite of the building in cold weather, for the purpose of supplying warmth. That the caretaker had a right to light the gas grate there can be no question, and that it was necessary for him to light it to keep warm there can be no question, because the record shows the weather to have been cold. That these acts were in any way connected with the uses of a roadhouse or hotel is beyond reason or comprehension. The unoccupied dwelling, with no one but a caretaker therein, is confirmatory proof consonant with the record that the village authorities were successful in closing the building as a roadhouse and hotel on January 9th, some two weeks before the fire.

Thus, from a reasoning of the facts in the case, it is our conclusion that the loss by fire was in no manner attributable to increased hazard. This we find to be true because of the facts causing the fire, and the termination some two weeks before the fire of the use of the building as a hotel, roadhouse, or gambling joint.

The purpose of the provision defeating recovery because of increased hazard is because the increased peril may cause the fire, and, if the loss ensues from a cause foreign to an increase of hazard, then there is no causal connection between the hazard and the fire, and there can be no failure of recovery by the assured, unless it be upon the theory that the increased hazard, having once begun, in law has never ended, and this does not seem to be the rule in Ohio.

We think this principle is clearly and convincingly

enunciated in the case of *Ohio Farmers' Ins. Co.* v. *Burget,* 65 Ohio St., 119, 61 N. E., 712, 55 L. R. A., 825, 87 Am. St. Rep., 596, and we think it is the law that applies to the facts in the instant case, where the increase of hazard, if existent at all, had ceased to operate at least some two weeks before the fire. The case just cited is good law in practically all of the state courts, even though the federal courts declare a different rule, but this latter rule cannot, and does not, affect the established rulings in Ohio.

The case of *Sumter Tobacco Warehouse Co.* v. *Phœnix Assurance Co.,* 76 S. C., 76, 56 S. E., 654, 10 L. R. A. (N. S.), 736, 121 Am. St. Rep., 941, 11 Ann. Cas., 780, holds that a temporary increase in risk which does violence to the terms of the fire insurance policy does not prevent recovery when the hazard has ended without any loss, and where the loss is derivable from a cause entirely independent of the hazard. This distinction between the federal and the state authorities is the reason why the federal court ruled against recovery on the part of the Sampliner Realty Company, on the ground that, as one of the assured, it was in possession of knowledge of the change in use. We think it is well settled in the record, as to Emily Morris, or the Guardian Trust Company, that neither one nor the other had any knowledge of the change of use. Mrs. Morris positively denied any knowledge, and there is no evidence that the Guardian Trust Company had any knowledge, or the means of knowledge, and the only ground upon which the assertion was made, charging it with knowledge, is that two Ætna insurance policies were later issued, wherein there was a reference to this building as a hotel, but, from

an examination of the record, the only ground for that claim is that the trust company ought to have known that the building referred to as a hotel was the dwelling house in question, but this is only an inference in our judgment, and is insufficient in substance as legal evidence to charge the trust company with knowledge that the dwelling in question was changed to a roadhouse or a hotel, there being numerous buildings upon the premises, and the trust company not having any specific knowledge establishing the identity of the structure as the dwelling house which had been insured by Emily Morris, which it is claimed was transformed into a roadhouse or hotel.

It must be remembered that there were 20 buildings on this tract of land. In some policies the building in question is referred to as a "two-story building" and in other policies as a "three-story building." These designations were in and of themselves confusing, and would do nothing to put the trust company in the possession of knowledge making it aware of the misuse of the structure under discussion.

When this question of identity arose in the cases that went to the United States Circuit Court of Appeals, above noted, we find the court using the following language, which we think is very opportune upon the question whether the trust company had knowledge or the means of knowledge charged against it:

"But we are cited to nothing in the Ætna policies which we think reasonably gave notice, even to those seeing the policies, that the building therein described as the 'hotel' was the same building de-

scribed in the policies here in suit as a dwelling house. * * * In fact, the dwelling house is described in the latter policies as a 'two-story, shingle-roof, frame building.' In the Ætna policies the 'hotel' is described as a 'three-story frame, shingle-roof building, known as Hotel.' An insurance clerk in the Trust Department of The Guardian Trust Company in 1923 and 1924, and down to the time of the trial below, testified that she had no knowledge, and that there is nothing 'on our record' to indicate, that the building described in the Ætna policies as a 'Hotel' is the building described in the policies in suit as a dwelling house.''

On this same point we find the United States Circuit Court of Appeals affirming Judge Westenhaver's language, which is as follows, and is worthy of reading because it shows how Knappen, J., of the Circuit Court of Appeals, and Westenhaver, J., of the United States District Court, analyze and treat this disputed point:

''I am of the opinion that it was necessary, in order to avoid the policy as to the mortgagee, or to avoid it as to Emily Morris, under the circumstances of the indorsement on the policy, and to avoid it as to the trustee representing the owner as to that insurance under the terms of the lease, that there should have been knowledge or notice thereof brought home to them. It is not enough that they should have had the means of knowledge. It is not enough that, by the exercise of a certain standard of diligence, the mortgagee or the trustee could have learned of the increased hazard. * * * If we should charge or attempt to charge them with a duty of active inquiry and investigation, we should

defeat the entire purpose of the insurance policy under the mortgage clause.''

We come now to the question whether the insurance companies received notice of the change in the use of the dwelling in question such a reasonable time before the destruction of the building by fire that they could have pursued their own course relative to a continuance or a discontinuance of the contracts of insurance, and we find that this question is interrelated to the issue raised in the case by plaintiffs below, that, while there might have been a temporary increase of hazard, it had ceased to operate, because it was nonexistent at the time of the fire, and, if the insurance companies had such a notice, then, of course, if they remained silent and inactive, the result would be the creation of the status of waiver, and, under this doctrine, if waiver existed, the relationship of the assured and the insured would be the same as existed prior to the creation of the hazard, and it would ,be immaterial whether the hazard was operative or inoperative. A waiver annihilates what would otherwise be the insuperable and impregnable.

In the course of the arguments, able opposing counsel presented numerous excerpts from the record, varying in their selections, and the charge and countercharge are made that in each excerpt portions of the testimony from the pages quoted were eliminated. Therefore we have studiously and meticulously examined these pages and other pages for the purpose of ascertaining whether notice of the change in the use of the dwelling went to the agents of the companies, and whether, in addition thereto, knowledge was brought home to the insur-

ance companies themselves, and this search of the record was made having in mind the authorities cited by counsel for the insurance companies, and we also had in contemplation the claims of counsel for plaintiffs in error that the terms and provisions of the insurance policies themselves curtailed the authority of the agents upon the question of waiver. These authorities which we had in mind as having a bearing upon the question under discussion are *Michigan Automobile Ins. Co.* v. *Van Buskirk,* 115 Ohio St., 598, 155 N. E., 186; *Ohio Farmers' Ins. Co.* v. *Titus,* 82 Ohio St., 161, 92 N. E., 82, and the authorities cited in *Michigan Automobile Insurance Co.* v. *Van Buskirk, supra,* wherein is discussed the question of knowledge of the insurance companies as to notice of any material change in the terms of the policy which would amount to a waiver, in the absence of due diligence. The controverted portions of the record, above referred to, are as follows:

"Q. Mr. Shaw, you say in August, 1924, that the insurance agency had notice that this building had been changed from a dwelling house to a hotel, did you?

"Mr. Chamberlain: I object to that.

"The Court: He is asking him on something he testified to, as I understood it, is that not your question, didn't he say so and so, in his direct examination?

"Mr. Chamberlain: I don't know what he means by 'insurance agency.'

"Mr. Horn: That is what I am trying to find out.

"The Court: You get his question? You called it an inspection bureau, didn't you?

"The Witness: Yes.

"Q. But in August, 1924, your concern had notice of a change in the use from a dwelling house to an hotel? A. Yes, sir.

"Q. And you rated it as an hotel thereafter? A. Yes, sir.

"Q. And was there any insurance written on that rate as an hotel? A. We have no means of knowing that.

"Q. Mr. Shaw, through what insurance agency were these policies in question written? A. According to the labels here they were all written through the firm of George H. Olmsted & Company.

"Q. And those are the agents of these insurance companies in the City of Cleveland, are they? A. They evidently were at that time. I don't know if they are now.

"Q. And your service gets to all the insurance agencies, fire insurance agencies doing business in the City of Cleveland doesn't it?

"Mr. Chamberlain: I object to that, Your Honor.

"The Court: It goes into the question of the waiver and notice? (Question read by reporter.)

"Mr. Horn: The purpose of it is to show that all the insurance agencies in the City of Cleveland had knowledge of this change of use from a dwelling to an hotel and calling for a rating on a higher rating.

"Mr. Chamberlain: We object to that, Your Honor.

"The Court: What is your objection to it? They brought out the bulletin.

"The Witness: I don't remember seeing it.

"The Court: Didn't you use your bulletin?

"Mr. Chamberlain: I didn't bring out anything like that. Here we have a written contract and no-

body can change it except the companies themselves. Proofs of loss don't go to brokers here in the city. That wouldn't affect us in any way. It would be varying the contract.

"The Court: It wouldn't be varying the contract if you get some notice of changed condition.

"Mr. Horn: Only that it is an Ohio statute that the agent is getting, the agent of the insurance company, not the agent of the owners of the property.

"The Court: In view of his other answer, I know he has answered that they publish a bulletin that goes to all their agents. (Last question read again by Reporter.) A. Yes, we publish a semi-weekly bulletin.

"Q. Twice every week your bureau sends out a bulletin to all the fire insurance agencies doing business in the County of Cuyahoga? A. All of those representing companies which subscribe to our bureau. Those are followed by rate cards.

"Q. And does the Evarts-Tremaine-Flicker Company subscribe to your bureau? A. No, sir.

"Q. Are you sure about that? A. Yes.

"Q. Does the George H. Olmsted Company subscribe to it? A. No.

"Q. Well, people doing business in both the offices of the Olmsted Company and the Flicker Company see it? A. Possibly.

"Q. But some people up there do then? A. The companies represented in those agencies all subscribe to our bureau.

"Q. That is, the companies represented by the agency The Geo. H. Olmsted Co. and the Evarts-Tremaine-Flicker Co., all subscribe to your bureau and get the information? A. Yes.

"Q. Twice every week? A. Yes.

"Q. And in August, 1924, you sent out a bulletin that this building had been changed from a dwelling to an hotel?—or September? A. You can't put it that way, we send out a bulletin giving the change in the rate from a residence to an hotel. We are rating it for a building for the first time.

"Q. And you gave it an hotel rate in August or September and sent that information to all of the insurance companies, didn't you? A. To the agencies here in Cleveland, yes.

"Q. So that the insurance companies and their agencies knew then that it was rated as an hotel?

"Mr. Chamberlain: I object.

"The Court: It is only argument. Sustained.

"Q. But anyhow your bulletin contained that information that you describe?

"Mr. Chamberlain: I object to that. He has answered that, your Honor.

"The Court: He has answered that.

"Q. And as far as you know there was no change after August, 1924, in that rating, was there? A. Yes, there was a change.

"Q. Before the fire? A. Yes.

"Q. Was it changed from the hotel rating? A. Yes. ·

"Q. Well, what was the rating? A. That was changed in December. We inspected the building on December 11th, and in our bulletin of December 17th we re-rated it, this time as a restaurant, without the hotel feature—do you see?

"Q. Why was that? A. We were given to understand that the guest rooms were no longer in use and that it was a restaurant.

"Q. But it was rated in December as a restaurant? A. Yes.

"Q. And you rated it as that at that time? A. One of our men inspected it on December 11th.

"Q. So from August, 1924, to December 11, 1924, your bureau knew it as an hotel? A. Yes.

"Q. That it was being used as an hotel? A. We called it as an hotel.

"Q. And beginning on December 11, 1924, you knew it was being used as a restaurant? A. We classed it as a restaurant, yes.

"Q. And an inspection was immediately made on December 11th and a bulletin sent out on December 18th? A. On December 17th.

"Q. And that went to all the insurance companies and agencies that you have described before? A. Yes.

"Q. Now, Mr. Shaw, when a building ceases to be used as a restaurant or hotel, ceases to be used for mercantile purposes then the owner of that building is entitled again to the lower rate, isn't he? A. When it goes back into the dwelling class, yes."

Now from a reading of this testimony as a whole it is settled beyond controversy that the agents had notice of the change in use, and while in our judgment the evidence is not as strong with respect to the insurance companies themselves, we think there is only one reasonable deduction and conclusion from the entire evidence, and that is that the companies themselves had possession of such notice as would put them upon guard and inquiry to such an extent that relief from the unwarranted situation as to change in use was solely and entirely in their own hands.

Hence it is our conclusion that the record discloses notice on the part of the insurance companies, as well as on the part of the agents, and thus the question of increased hazard is reduced to a minor, inconsiderable, and immaterial element in the case. Therefore it is our unanimous judgment that upon this point, as well as upon all other points herein considered, there is no foundation for the assignment of error with respect to notice and increase of hazard.

From an examination of the whole record and each and all of the assignments of error, the entire court is in harmony with the view that there is no cause for the reversal of the judgments below, and that substantial justice has been done, and consequently the judgments of the lower court are hereby affirmed, and this entry of affirmance will be made in all the cases appearing in the caption hereof.

*Judgments affirmed.*

VICKERY and LEVINE, JJ., concur.