## NORTHERN ASSURANCE COMPANY OF AMERICA, Plaintiff,

v.

### David SPENCER and wife, Mary R. Spencer, Defendants.

#### Civ. No. 1877.

United States District Court
W. D. North Carolina,
Charlotte Division.

Oct. 26, 1965.

Walter L. Horton, Jr., Raleigh, N. C., for plaintiff.

Corne & Warlick, Newton, N. C., and James C. Smathers, Hickory, N. C., for defendants.

CRAVEN, Chief Judge.

Northern Assurance Company of America (hereinafter called Northern) brings this action for declaratory judgment under Title 28 U.S.C.A. §§ 2201 and 2202 to obtain a declaration of its rights and liabilities under a homeowners fire insurance policy issued to David S. Spencer.

Jurisdiction is based upon diversity of citizenship.

Rejecting hearsay and other incompetent evidence which may have been erroneously received, I find from the competent evidence and by its greater weight the facts to be as follows:

Spencer owned a house and lot at 1517 Seventeenth Avenue, Hickory, North Carolina, subject to a mortgage on the property with Fidelity Federal Savings and Loan Association (hereinafter called Fidelity) for the sum of $9,000.00. On June 16, 1961, Northern issued to Spencer for a period of three years a homeowners fire insurance policy. Total coverage on the dwelling was limited to $11,000.00; there was $1,100.00 coverage on appurtenant private structures; $4,400.00 coverage on unscheduled personal property; and $2,200.00 coverage for additional living expense resulting from a fire.

Spencer has been in the hosiery business for about sixteen years. Most of that time he worked for someone else. Sometime during the summer of 1962 he decided to go into the hosiery business for himself, and in September of 1962 he purchased from High Point Machine Company seventeen Bentley-Comet knitting machines. The bill of sale shows the machines were delivered to his home on September 28, 1962. The purchase price was $5,500.00.

To accommodate the machines Spencer had a basement dug underneath his home; the floor was cement, the walls were cinderblock, and the roof was open showing the exposed rafters from the floor above. Lighting was provided by suspended fluorescent fixtures. The knitting machines are about four to five feet high and about three feet wide. They are operated by a system of belts and pulleys, which, in turn, are operated by a three

horsepower electric motor. To run the machines and additional lighting it was necessary to use heavier electric cable than is normally used for a dwelling. Four people operated the knitting machines: Spencer, his wife, his son, and one other knitter. Prior to Christmas 1962 Spencer worked only part time in his basement mill; after that he worked full time there.

In August 1962 Spencer applied for a loan of $5,500.00 at Fidelity— the amount needed to buy the knitting machines. At the time of application he disclosed to Fidelity the purpose of the loan: to purchase knitting machines to enable him to go into the hosiery business for himself at his home.

On August 16, 1962, Mr. Little, Vice President of Fidelity, and Mr. Laffon, an appraiser, went to the Spencer home to inspect it. They did not go into the basement. The machines were not on the premises at that time.

When he applied for the loan Spencer was told that he would be required to increase the amount of fire insurance on his home.

Immediately thereafter Spencer went to the office of R. A. Tunstall, agent for Northern, and talked with the only person in the office: Miss Mary Louvenia Poteat, an employee clerk of the Tunstall Agency. Ordinarily Miss Poteat did not talk to customers about their insurance needs and did not herself write up insurance policies, except under the direct supervision of Mr. Tunstall or Mrs. Pat Burns, Tunstall's general secretary and office manager. But when Mr. Tunstall and Mrs. Burns were busy or absent from the office, Miss Poteat was authorized to fully act for the agency and to deal with the clients. She had been working there about a year. Spencer was not previously acquainted with Miss Poteat and did not know that she was relatively inexperi-

enced, as compared with Mrs. Burns and Mr. Tunstall. Spencer told Miss Poteat (1) that he was borrowing $5,500.00 for the purpose of enabling him to purchase seventeen Bentley-Comet knitting machines to be placed in and operated in the basement of his home, and (2) that Fidelity Federal Savings and Loan Association required him to increase the fire insurance coverage on his house before it would loan him the money for the purchase of the machines. As a result of this conversation, Miss Poteat simply made a note for Mrs. Burns or Mr. Tunstall's action that the policy was to be increased an additional $1,000.00. On October 9, 1962, Mrs. Burns prepared an endorsement on the policy increasing coverage on the dwelling from $11,000.00 to $12,000.00.

On August 1, 1963, a fire occurred in Spencer's dwelling. The blaze started in and was confined primarily to the garage, although other parts of the house were severely damaged. The basement area and the knitting machines were not damaged. Eight machines were being operated in the basement at the time of the fire. Total damage to the dwelling alone was estimated by an expert to be about $11,500.00.

Inside the garage at the time of the fire were an automobile, a motorcycle, two cases of spooled Banlon yarn and two cases of finished Ban-lon socks. The yarn and socks were on one side of the garage and the motorcycle and car were on the other side. Mr. Fred C. Schell, chief of the St. Stephens Volunteer Fire Department, testified, and I accept his testimony, that when he looked into the garage the automobile and motorcycle were burning fiercely, and the spools of yarn were also burning, but only on the outside of the spools. Mr. Cloyd C. Propst, another fireman, testified, and I so find, that most of the fire was concentrated in the automobile, and that

the flame in the motor was making a loud noise, like a blowtorch.

Mr. James H. Edwards, an independent fire investigator hired by Northern to investigate the fire, testified, and I so find, that part of the hosiery and some of the yarn had burned, but that the yarn was mostly melted and fused together. He further testified as an expert, and I so find, that Ban-lon yarn will burn, but if left to burn by itself the flame would go out. Ban-lon material is not easily combustible.

It was two years after the fire before Spencer moved back into his home. During this period he lived in a trailer for three months, paying $80.00 per month rent. Afterwards he bought another home in Hickory in which he lived for awhile and which he now rents. More than a year after his home burned he undertook the repairs himself. Actual repair took three months, has cost to date approximately $7,500.00, and is incomplete. The insurance policy contains a standard mortgage clause under which Northern has paid to Fidelity, as mortgagee, the sum of $11,100.00—the amount due on the loan at the time of the fire loss. Spencer's proof of loss, filed with Northern on February 20, 1964, totaled $18,200.00, and by counterclaim he seeks to recover $7,-100.00—the difference between the sum paid by Northern and the sum claimed in the proof of loss statement. This amount Northern has so far refused to pay.

In summary, I find the ultimate facts to be as follows:

(1) The alteration, by Spencer, of his home (i. e., putting in a basement) to accommodate the knitting machines did not cause or contribute to the fire;

(2) The actual operation of the machines in the basement did not cause or contribute to the fire;

(3) Temporarily storing the Banlon hosiery and yarn in the garage of his home did not cause or contribute to the fire;

(4) The change of use, i. e., putting a hosiery mill in the basement of his home, increased the *risk* of fire, although such risk did not cause or contribute, directly or indirectly, to the fire;

(5) Spencer fully disclosed to Miss Poteat his contemplated change in the use of the premises and specifically advised her that he would operate the hosiery machines in the basement of his home;

(6) Northern's independent adjuster visited the premises within one week after the fire and talked with Spencer, who freely gave him all information requested. From the very beginning Spencer presented his claim to the adjuster and the company and insisted that he be indemnified by Northern. The adjuster reported the claim promptly to the company. At all times Northern's agent and the adjuster had proof of loss forms, but neither ever furnished the same to Spencer.

(7) Spencer did not file a formal proof of loss until approximately seven months after the fire.

### INCREASING THE RISK

Northern's policy in this case is a standard homeowners fire insurance policy providing coverage for direct loss by fire and other perils described in the policy.

The policy provides at lines 28–32 as follows:

"CONDITIONS SUSPENDING OR RESTRICTING COVERAGE. Unless otherwise provided in writing added hereto, this company shall not be liable for loss occurring (a) while the hazard is increased by any means within the control or knowledge of the insured."

Clearly, putting a hosiery mill in one's basement increases the fire hazard. If

the policy is read literally it seems to mean that the policy is forfeited by reason of a change of condition on the premises increasing the hazard. Such a narrow construction must be premised on the time-honored proposition that the parties are free to negotiate with one another and determine the provisions that shall be included in the policy. They are—in theory. But how many dwelling owners have ever been successful in persuading fire insurance companies to omit such clauses, or, indeed, any clauses? If a dwelling owner wants fire insurance he takes the policy as printed or not at all. See N.C.G.S. § 58–176, which partially establishes the contents of a fire policy.

Where *all* the evidence tends to show that the increased hazard neither contributed to nor caused the fire, it seems harsh indeed to permit the company to assert forfeiture under a literal reading of the suspension clause. It would be a far different matter if there were any evidence tending to show the assured deceived the company in an effort to obtain a lower premium. Where the risk bears no causal relationship to the fire and there is no deception on the part of the policyholder, it seems that the company would be fully protected by giving it the right to collect additional premiums to cover the additional risk rather than giving it the extreme remedy of declaring the policy forfeited. Such a reasonable result was reached in an analogous situation involving the clearly increased risk of a male driver under the age of 25 years in a family. State Farm Mutual Automobile Insurance Co. v. Shaffer, 250 N.C. 45, 108 S.E.2d 49, at 54. As was said in Joyce v. Maine Insurance Co., 45 Me. 168, 71 Am.Dec. 536, it cannot be "assumed that the company, if notified (of the increased risk) would have terminated the insurance", and it was held that the liability of the company on the policy continued for a loss *not* due to the increase of risk. 29A Am.Jur. 96 "Insurance" Section 885. See also Northern Insurance Co. v. Morris, 30 Ohio App. 458, 165 N.E. 506,

where it was held under a provision similar to the one in this suit that the liability of the insurer is not avoided where the loss resulted from a cause other than the increased hazard. 45 C.J.S. Insurance § 551, p. 292.

The following appears in Strong's North Carolina Digest "Insurance" Section 77 entitled "Forfeiture of Policy for Breach of Conditions Relating to Use or Condition of Property", and is the only entry under this subtitle: "Where a policy of fire insurance on a boat provides for forfeiture in case gasoline is kept thereon, but attached thereto is a rider permitting the use of oil for fuel, and the evidence discloses that a small quantity of gasoline necessary for the starting of the crude oil engine was kept on that boat, and that the loss was not caused by the gasoline catching fire, the evidence should be submitted to the jury, and the granting of defendant's motion as of nonsuit is error."

In Fidelity-Phenix Fire Insurance Co. of New York v. Pilot Freight Carriers, 193 F.2d 812, 31 A.L.R.2d 839 (4th Cir. 1952), Judge Soper included in his opinion what appears to be a dictum that under the law of North Carolina no causal connection need be shown between the breach and the loss if the loss occurs while the breach continues, citing Ritchie v. Travelers' Protective Association, 203 N.C. 721, 166 S.E. 893. Plainly Judge Soper thought that there *was* a causal connection on the facts of the given case. Smith v. National Fire Insurance Co., 175 N.C. 314, 95 S.E. 562, is purportedly distinguished.

It is not at all clear to me, after examining these cases which point in different directions, that the North Caroline Supreme Court would today hold that a policy of fire insurance is forfeited by increasing the risk *absent* any causal relationship between the increased risk and the fire, and *absent* any deception on the part of the assured. Final decision must await determination by the Supreme Court of North Carolina, which alone can speak authoritatively with respect to North Carolina law. For-

tunately, my decision can be reached on another basis.

## ESTOPPEL AND WAIVER

 If the policy was suspended by reason of the increase of risk, nevertheless, the insurer is estopped to deny coverage. Spencer made a full disclosure to a clerk in the insurance company's office of his intention to increase the risk. He did all that could reasonably be expected of him in attempting to inform his insurer of the change in conditions on his premises.

 "One dealing with an insurance agency under ordinary circumstances need not concern himself with the extent of the authority of an employee in the agent's office who undertakes to act for the agent; the apparent authority with which such employee is clothed by the agent renders him and his principal liable regardless of the actual limits of the authority of the employee." 29A Am.Jur. 207 "Insurance" Section 1036.

 "A waiver by, or an estoppel against, an insurer may arise from the act, conduct, omission, or knowledge of a duly authorized representative of the insurer acting within the scope of his actual or apparent authority. * * *" 29A Am.Jur. 218 "Insurance" Section 1048.

 In the absence of fraud or collusion, and when acting within the scope of his authority, the agent's knowledge is in law the knowledge of the insurer, although not in fact communicated to the insurer. King v. National Union Fire Insurance Co., 258 N.C. 432, 128 S.E.2d 849 (1963); Thomas-Yelverton Co. v. State Capital Life Insurance Co., 238 N.C. 278, 77 S.E.2d 692 (1953); Blue Bird Cab Co. v. American Fidelity & Casualty Co., 219 N.C. 788, 15 S.E. 2d 295 (1941).

The above principle is especially applicable in this case because Northern entrusted its agent, Tunstall, with blank applications and policies already signed by its officers. The language of Mr. Justice Avery in Grubbs v. North Carolina Home Insurance Co., 108 N.C. 472, 13 S.E. 236 (1891), is pertinent: "(I)f Dr. Ramsey was intrusted by the defendant (as he testified that he was) with the blank applications and with its policies duly signed by its officers, and was authorized to take risks without consulting the company, to issue policies by simply signing his name as agent, to collect premiums, and cancel policies, then he was empowered as agent to waive the condition that no additional insurance should be taken."

 According to the great majority of cases, an insurance company may waive, or be estopped to rely on, a provision or condition in a policy of insurance relating to use or condition of property. 29A Am.Jur. 187–188 "Insurance" Section 1013. See Faircloth v. Ohio Farmers Insurance Co., 253 N.C. 522, 117 S.E.2d 404 (1960), to the same effect with reference to the change of location of property insured.

 The knowledge of Miss Poteat that Spencer was going to increase the risk is imputed to the insurer. The insurer is thus held to have acquiesced to the change of hazard and is estopped to assert the suspension clause.

## 60 DAY CLAUSE

The policy provides that proof of loss must be filed within 60 days after the loss. But it does *not* provide for suspension or forfeiture upon failure to comply. Spencer did not file his proof of loss until seven months after it occurred. Such a provision requiring formal proof of loss within 60 days must be for the purposes, among others, of protecting an insurance company from fraudulent claims which may be asserted long after an alleged fire and to permit it opportunity to have its adjuster promptly investigate claims made under the policy. Here the company was notified immediately, and its own independent adjuster appeared on the scene the next morning "for the very purpose

of determining and adjusting the loss". See Zibelin v. Pawtucket Mutual Fire Insurance Co., 229 N.C. 567, 50 S.E.2d 290, at 292 (1948). The adjuster formally reported the loss to the company, had an appraisal made, and discussed the loss with the policyholder on numerous occasions. Although the adjuster had in his possession proof of loss forms [1] for the purpose of helping policyholders comply with the policy provisions, he failed to furnish to this policyholder any such form nor even suggested that he ought to file one. Spencer repeatedly demanded payment of his claim, making such demands to the independent adjuster and also to the local agent of the company. Plainly no harm resulted to the company from Spencer's failure to file a formal proof of loss. His intention and his claim were plainly communicated to it within apt time.

■ But if it be assumed, even on these facts, that literal compliance with the requirement is a prerequisite to enforcement of the policy, the company is estopped to insist upon it.

The company never denied to Spencer its liability and never claimed to him that the policy was forfeited—for any reason whatsoever. See Gardner v. Carolina Insurance Co. of Wilmington, 230 N.C. 750, 55 S.E.2d 694 (1949), and Zibelin v. Pawtucket Mutual Fire Insurance Co., supra, which are to the effect that denial of liability (on another ground) is a waiver of the 60 day proof of loss requirement. Instead, the company, through its general agent, Mr. Tunstall, aided and abetted by its adjuster, lulled Spencer into a false sense of security. Repeatedly he was assured the company would pay the loss. He was so taken in by the company's assurances that for two months after the fire he continued to make his mortgage payments to Fidelity.

■ It would be unconscionable under such circumstances to now permit the company to insist upon literal compliance with the 60 day proof of loss clause. Since the company, through its adjuster, got everything it wanted, even an appraisal, with respect to this fire, it is not unreasonable to infer that the company did not get the proof of loss within 60 days for one reason only: it did not want it. It cannot now insist upon it. "An insurance company which causes or induces the insured to delay in furnishing sufficient notice and proofs of loss thereby waives such delay." 45 C.J.S. Insurance § 982(6) d (c), p. 1204. Cf. Meekins v. Aetna Insurance Co., 231 N.C. 452, 57 S.E.2d 777, at 781, 15 A.L. R.2d 949 (1950), where the court held waiver and estoppel to be a jury question "if the defendant, by its promises and conduct, was responsible for the delay in filing a proper proof of loss * * *." The court further held that if the insurer waived the time for filing such proof until the end of twelve months after the fire, it would be estopped from enforcing the provision in the policy which requires the action to be brought within twelve months next after the fire.[2]

Insufficient evidence was received at the trial with respect to the amount of the fire loss to enable me to determine precisely how much Spencer is entitled to recover from Northern. Perhaps counsel can reach some agreement as to the amount Northern ought to pay Spencer in addition to the amount already paid Fidelity. If not, on motion of either party, the trial will be resumed and further evidence received with respect to the loss only.

1. See N.C.G.S. § 58-31.1.

2. Query: Does the twelve month statute of limitation in the policy even apply where the insured does not bring the action, but is defending an action for declaratory judgment brought by the insurer?